**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Noble Capital RSD LLC<br><br>*Plaintiff*,<br><br>v.<br><br>The Russian Federation, The Ministry of Finance of the Russian Federation, the Central Bank of the Russian Federation, and the Russian National Wealth Fund<br><br>*Defendants.* | CIVIL ACTION<br><br>No. 25-cv-1796 (DLF) |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
ITS MOTION TO DISMISS FOR LACK OF SUBJECT MATTER AND PERSONAL
JURISDICTION UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT**

Bruce S. Marks (Bar I.D. C0034)
Thomas Sullivan (Bar I.D. PA0122)
Maria Grechishkina (Bar I.D.PA0199)
Marks & Sokolov, LLC
1835 Market St., 17th floor
Philadelphia, PA 19103
Tel: (215) 569-8901
marks@mslegal.com

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

THE END OF THE RUSSIAN EMPIRE IN 1917 AND CREATION OF THE RSFSR ............. 3

THE BOLSHEVIK GOVERNMENT'S REJECTION OF LIABILITY FOR THE
    RUSSIAN EMPIRE'S DEBTS, INCLUDING THE 1916 BONDS ................................. 3

THE CREATION OF THE USSR IN 1922 AND ITS REJECTION OF LIABILITY FOR
    THE RUSSIAN EMPIRE'S DEBTS, INCLUDING THE 1916 BONDS ........................ 4

THE DISSOLUTION OF THE USSR AND REPLACEMENT WITH SUCCESSOR
    STATES IN 1991 .................................................................................................... 4

THE SUCCESSOR STATES ADDRESS THE USSR'S DEBTS AND ASSETS ...................... 5

RECOGNITION OF THE RF AS A SUCCESSOR STATE TO THE USSR ............................ 7

BILATERAL TREATIES ADDRESSING DISPUTED IMPERIAL DEBT .............................. 8

POST-DISSOLUTION AGREEMENTS ..................................................................................... 9

THE GEOGRAPHY OF THE RUSSIAN EMPIRE, RSFSR, USSR, AND RUSSIAN
    FEDERATION .......................................................................................................... 10

THE RUSSIAN STATE ENTITIES AT ISSUE ........................................................................ 10

NOBLE'S HISTORY OF FRIVOLOUS CLAIMS .................................................................... 11

SOURCES OF INTERNATIONAL LAW ................................................................................. 12

ARGUMENT ........................................................................................................................... 12

I.     *CARL MARKS* IS ISSUE PRECLUSIVE ON SUBJECT-MATTER
        JURISDICTION ....................................................................................................... 13

      A.    The Identical Issue Was Litigated......................................................................... 15

      B.    The Identical FSIA Determination Was Essential to the Judgments.................... 16

      C.    Issue Preclusion Works No Basic Unfairness to a Party Bound by the First
           Determination .................................................................................................. 16

II.    NOBLE FAILS TO PLEAD CLAIMS UNDER THE CLAUSES OF §1605(a)(2) ........ 17

      A.    Commercial Exception Clause One Does Not Apply........................................... 18

      B.    Commercial Exception Clause Two Does Not Apply .......................................... 20

C.    Commercial Exception Clause Three Does Not Apply ........................................ 21

    1.    The Second Requirement of Clause Three Does Not Apply ................... 21

    2.    The Third Requirement of Clause Three Does Not Apply ...................... 22

III.    THIS COURT LACKS JURISDICTION UNDER FSIA BECAUSE THE RF IS A SUCCESSOR STATE, NOT SUCCESSOR GOVERNMENT, TO THE USSR ........ 24

IV.    THIS COURT LACKS FSIA JURISDICTION UNDER THE POLITICAL-QUESTION DOCTRINE BECAUSE RECOGNIZING LIABILITY AMONG SUCCESSOR STATES IS RESERVED TO THE EXECUTIVE BRANCH AND THE COURT HAS NO CRITERIA TO ESTABLISH OR APPORTION SUCCESSOR-STATE LIABILITY ................................................................................. 28

A.    Issues Raised by the Complaint ......................................................................... 29

B.    The *Baker* Factors Compellingly Establish Political Questions .......................... 30

    1.    The Issue Involves Questions Committed by the Constitution to the Executive Branch ................................................................................ 31

    2.    Resolution of the Question Demands the Court Move Beyond Its Judicial Expertise ............................................................................... 32

    3.    Prudential Considerations Strongly Counsel Against Judicial Intervention .................................................................................... 34

C.    The Political Questions Are Inextricable from Noble's Claims ........................... 35

V.    THIS COURT LACKS FSIA JURISDICTION OVER THE MINISTRY OF FINANCE, CENTRAL BANK, AND NATIONAL WEALTH FUND ........................ 35

A.    There Is No Basis to Extend Successor-Government or Successor-State Liability to These Defendants ............................................................................. 36

B.    Noble Fails to Meet Its Burden to Establish Alter-Ego Liability ......................... 36

VI.    THIS COURT LACKS JURISDICTION UNDER FSIA TO GRANT DECLARATORY OR INJUNCTIVE RELIEF OVER DEFENDANTS IN THE ABSENCE OF A COGNIZABLE CLAIM ................................................................... 39

CONCLUSION ............................................................................................................ 41

# TABLE OF AUTHORITIES

## Cases

*767 Third Ave. Assocs. v. Consulate Gen. of Socialist Federation of Yugoslavia*,
  218 F.3d 152 (2d Cir. 2000) ............................................................27, 31, 32, 33, 35

*Abdullahi v. Pfizer, Inc.*,
  562 F.3d 163 (2d Cir. 2009) ................................................................................12

*Agudas Chasidei Chabad of United States v. Russian Federation*,
  528 F.3d 934 (D.C. Cir. 2008) ...........................................................................26

*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019) .....................................................................29, 30, 35

*Ali v. Rumsfeld*,
  649 F.3d 762 (D.C. Cir. 2011) ............................................................................40

*Allen v. McCurry*,
  449 U.S. 90 (1980) ..............................................................................................13

*Antolok v. United States*,
  873 F.2d 369 (D.C. Cir. 1989) ......................................................................30, 35

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) ............................................................................................12

*Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992) ................................................................................20, 21, 24

*Asociacion de Reclamantes v. United Mexican States*,
  735 F.2d 1517 (D.C. Cir. 1984) ....................................................................33, 35

*Baker v. Carr*,
  369 U.S. 186 (1962) ..............................................2, 28, 29, 30, 31, 32, 33, 34, 35

*Bancoult v. McNamara*,
  445 F.3d 427 (D.C. Cir. 2006) ............................................................................29

*Base One Techs., Inc. v. Ali*,
  78 F.Supp.3d 186 (D.D.C. 2015) ........................................................................40

*Belize Soc. Dev., Ltd. v. Gov't of Belize*,
  794 F.3d 99 (D.C. Cir. 2015) .........................................................................12, 13

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
  734 F.3d 1175 (D.C. Cir. 2013) ............................................................12, 13, 17, 36

*Berryman-Turner v. District of Columbia*,
  233 F.Supp.3d 26 (D.D.C. 2017) ...............................................................17

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  581 U.S. 170 (2017) .......................................................................12, 13

*Brown v. Wells Fargo Bank, N.A.*,
  25 F.Supp.3d 144 (D.D.C. 2014) .............................................................17

*Butler v. Sukhoi Co.*,
  579 F.3d 1307 (11th Cir. 2009) ...................................................17, 18, 28

*Can v. United States*,
  14 F.3d 160 (2d Cir. 1994)...........................................................31, 32, 34, 35

*Carl Marks & Co., Inc. v. Union of Soviet Socialist Republics*,
  665 F.Supp. 323 (S.D.N.Y. 1987) ..................................................... *passim*

*Cooper v. Federal Reserve Bank*,
  467 U.S. 867 (1984) .............................................................................17

*Despotovich v. Republic of Croatia*,
  2023 U.S. App. LEXIS 20238 (2d Cir. 2023) .........................................38

*Dozier v. Ford Motor Co.*,
  702 F.2d 1189 (D.C. Cir. 1983) ..............................................................16

*EM Ltd. v. Banco Cent. De la Republica Argentina*,
  800 F.3d 78 (2d Cir. 2015) ...........................................................37, 38, 39

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990) ...............................................................37

*GAF Corp. v. United States*,
  818 F.2d 901 (D.C. Cir. 1987) .........................................................15, 16

*Glenn v. Fay*,
  222 F.Supp.3d 31 (D.D.C. 2016) ............................................................40

*Goldwater v. Carter*,
  444 U.S. 996 (1979)..............................................................................30

*Guaranty Trust v. United States*,
  304 U.S. 126 (1938) ............................................................................25

*Guirlando v. T.C. Ziraat Bakasi S.A.*,
  602 F.3d 69 (2d Cir. 2010) ....................................................................21

*Jaber v. United States*,
  861 F.3d 241 (D.C. Cir. 2017) ...............................................................30

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1986) ...................................................................................29

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
  456 U.S. 694 (1982) ...............................................................................15, 16

*Jackson v. People's Republic of China*,
  596 F. Supp. 386 (N.D. Ala. 1984) ......................................................14, 15

*Jackson v. People's Republic of China*,
  794 F.2d 1490 (11th Cir. 1986)……………………………………………14, 15

*Joo v. Japan*,
  413 F.3d 45 (D.C. Cir. 2005) ......................................................................29

*Kialegee Tribal Town v. U.S. DOI*,
  2022 U.S. Dist. LEXIS 177829 (D.D.C. Sept. 29, 2022) ....................40, 41

*Mark v. Republic of the Sudan*,
  77 F.4th 892 (D.C. Cir. 2023) ...............................................................33, 34

*Miriyeva v. U.S. Citizenship & Immig. Servs.*,
  9 F.4th 935 (D.C. Cir. 2021) .......................................................................41

*MMA Consultants 1, Inc. v. Republic of Peru*,
  719 Fed. App'x 47 (2d Cir. 2017) ...............................................18, 19, 20, 24

*Morris v. People's Republic of China*,
  478 F.Supp.2d 561 (S.D.N.Y. 2007) ...........................................................23

*Mortimer Off Shore Servs. v. Fed. Republic of Germany*,
  615 F.3d 97 (2d Cir. 2010) ....................................................................22, 36

*Mortimer Off Shore Servs., Ltd. v. Germany*,
  2012 U.S. Dist. LEXIS 42993 (D. Mass. Mar. 28, 2012) ...........................16

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ....................................................................................14

*Noble Capital LLC v. People's Republic of China*,
  2025 U.S. Dist. LEXIS 180351(D.D.C. Sep. 15, 2025) ........................11, 20

*Noble v. People's Republic of China*, No. 1:24-cv-08257-VSB (S.D.N.Y. filed Oct. 30, 2024)..12

*Noble Capital LLC v. People's Republic of China*, No. 25-cv-6146, Complaint (N.D. Ill. filed June 2, 2025)..........................................................................................................11

*OBB Personevnerker AG v. Sachs*,
  577 U.S. 27 (2015) ......................................................................................18

v

*Pablo Star Ltd. v. Welsh Gov't,*
  170 F.Supp.3d 597 (S.D.N.Y. 2016) ............................................36

*Process & Industrial Developments, Ltd. v. Federal Republic of Nigeria,*
  962 F.3d 576 (D.C. Cir. 2020) ....................................................1, 13, 17

*Rogers v. Petroleo Brasileiro, S.A.,*
  673 F.3d 131 (2d Cir. 2012).......................................................20, 21

*Rukoro v. F.R.G.,*
  976 F.3d 218 (2d Cir. 2020) ......................................................41

*Saudi Arabia v. Nelson,*
  507 U.S. 349 (1993)...................................................................19

*Sequeira v. Republic of Nicaragua,*
  815 Fed. App'x 345 (11th Cir. 2020) ........................................18, 28

*Schlesinger v. Reservists Comm. to Stop the War,*
  418 U.S 208 (1974)....................................................................29

*Schneider v. Kissinger,*
  412 F.3d 190 (D.C. Cir. 2005).....................................................30

*Sosa v. Alvarez-Machain,*
  542 U.S. 692 (2004)...................................................................27

*Taylor v. Sturgell,*
  553 U.S. 880 (2008) ..................................................................13, 16

*TIG Ins. Co. v. Republic of Argentina,*
  110 F.4th 221 (D.C. Cir. 2024) .................................................36, 38

*Turan Petro. Inc. v. Ministry of Oil & Gas of Kazakhstan,*
  2022 U.S. App. LEXIS 7980 (D.C. Cir. 2022) ...........................41

*United States v. Yousef,*
  327 F.3d 56 (2d Cir. 2003) ........................................................27

*Westinghouse Elec. Co. LLC v. Korea Elec. Power Corp.,*
  694 F.Supp.3d 48 (D.D.C. 2023) ...............................................40

*Whiteman v. Dorotheum GmbH & Co. KG,*
  431 F.3d 57 (2d Cir. 2005) ........................................................34

*Williams v. Romarm S.A.,*
  2020 U.S. Dist. LEXIS 57029 (D.D.C. Apr. 1, 2020) ................16

*Yamaha Corp. of Am. v. United States,*
  961 F.2d 245 (D.C. Cir. 1992) ...................................................13

*Yucyco, Ltd. v. Republic of Slovenia*,
  984 F. Supp. 209 (S.D.N.Y. 1997) ........................................................................27, 28, 32, 34

**Statutes**

28 U.S.C. §1604 ................................................................................................................1

28 U.S.C. §1605.............................................................................................. *passim*

**Treaties**

Treaty on the Formation of the USSR (Dec. 30, 1922) ....................................................4

Treaty on Succession to the External State Debt and Assets of the
USSR (Dec. 4, 1991) ....................................................................................................5, 6

Treaty between the United States of America and the Union of Soviet Socialist Republics on the
Reduction and Limitation of Strategic Offensive Arms (START I) (May 23, 1992).................7, 8

Protocol to the Treaty between the United States of America and the Union of Soviet Socialist
Republics on the Reduction and Limitation of Strategic Offensive Arms (May 23, 1992) ...........8

**Publications and other Authorities**

*767 Third Avenue Associates v. Consulate General of the Socialist Federal Republic of
Yugoslavia, et al.,* Docket No. 99-9011, Brief for Amicus Curiae United States of America (2d
Cir. Jan. 31, 2000).........................................................................................................27

Bentsen, Fedorov Sign U.S./Russia Debt Accord (U.S. Department of the Treasury Press
Release, Treasury News, Sept. 30, 1993…………………………………………………………10

Bush, George, Address to the Nation on the Commonwealth of Independent States (December
25, 1991) ....................................................................................................................7, 26

Denza, Eileen & Poulsen, Lauge, *Settling Russia's Imperial and Baltic Debts,*
117 Am. J. Int'l L. 441 (2023) ..........................................................................................4

Kheyfets, Boris, *External Loans and Debts of the Tsarist Russia: History and Modern Situation*
(2002) ...............................................................................................................................8

Lienau, Odette, Rethinking Sovereign Debt, Harvard University Press (2014)...........................4

*Russia Redeeming Czar's Bonds,* by Agence France-Presse, New York Times (November 19,
2000) .................................................................................................................................9

Restatement of the Law, Third: The Foreign Relations Law of the United States (1986) ......26, 27

SEC Litigation Release No. 15989 (Dec. 1, 1998) .......................................................................23

SEC Litigation Release No. 18393 (Oct. 6, 2003) .......................................................................23

vii

**International Authorities**

ABM Memorandum of Understanding among the U.S., Belarus, Kazakhstan, the RF, and Ukraine...................................................................................................................7, 26

Agreement on the Distribution of All Property of the Former USSR Abroad (July 6, 1992).........6

Agreement on the Establishment of the Commonwealth of Independent States (December 8, 1991) ...................................................................................................................................6

Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Union of Soviet Socialist Republics concerning the Settlement of Mutual Financial and Property Claims arising before 1939 (July 15, 1986) ("UK Settlement"). ......................................................................................................................9, 33

Agreement between the Government of the Russian Federation and the Government of the French Republic on the final settlement of mutual financial and property claims arising before May 9, 1945 (May 27, 1997) ("French Settlement")..............................................................9, 33

Agreement between the Russian Federation and the Republic of Armenia on the settlement of issues of succession in relation to the external public debt and assets of the former USSR (September 7, 1993).......................................................................................................7

Agreement on the External State Debt and Assets of the USSR (December 4, 1991)...................5

Constitution of the RF (December 12, 1993).........................................................................10, 11

Declaration on the Establishment of the Commonwealth of Independent States (Dec. 21, 1991) ("Alma-Ata Declaration").....................................................................................................6, 26

Declaration of the Rights of the Working and Exploited People (January 13, 1918) ....................3

Decree "On the rules for the Application of the Decree on the Cancellation of Government Loans" (March 7, 1918)..........................................................................................................3

Decree of the All-Russia Central Executive Committee on the Annulment of State Loans (January 21, 1918) ...................................................................................................................3

Decision of the Council of Heads of State of the CIS (March 20, 1992) ..................................6, 26

Decision of the Council of CIS Heads of State "On the activities of the Commission for the consideration of a range of issues related to succession in relation to treaties of mutual interest, state property, state archives, debts, and assets of the former USSR" (October 9, 1992)...............6

Exchange of notes establishing normal diplomatic relations between the United States and the Soviet Union, signed via correspondence between President Franklin D. Roosevelt and Soviet Commissar Maxim Litvinov (November 16, 1933) .......................................................8, 9, 28, 33

Federal Statute of the Russian Federation on the Central Bank of the Russian Federation, No. 86-FZ (July 10, 2002)..................................................................................................................11

Law of the RSFSR of No. 2094-I "On the change of the name of the state Russian Soviet Federative Socialist Republic" (December 25, 1991).....................................................................6

Reply of Russian Delegation to Memorandum of May 2, 1922, Genoa Conference (May 11, 1922) ........................................................................................................................................3

Report on Meetings between RF and Paris Club creditor countries (April 9, 1993).....................10

Yeltsin, Boris, Letter to UN General Secretary, dated Dec. 24, 1991 ............................................8

## PRELIMINARY STATEMENT[1]

Plaintiff Noble Capital RSD LLC ("Noble"), eponymously named after its counsel, seeks declaratory judgments and injunctive relief against the Russian Federation ("RF"), and its Ministry of Finance, Central Bank, and National Wealth Fund (collectively, "Defendants"). It outrageously claims these sovereign Defendants owe ***$225.8 billion*** based on a ***single*** $1,000 Russian Imperial Sovereign Bond ("1916 Bond") apparently purchased to launch this litigation. This Court lacks subject-matter and personal jurisdiction over foreign states under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1604, absent an exception under §1605(a). Noble does not plead which exception applies—reason alone to dismiss. Given its allegations, only the §1605(a)(2) "commercial activity" exception appears relevant. Multiple grounds, independently dispositive, establish this exception does not apply. The Court must dismiss.

***First,*** this Court lacks jurisdiction based on *Carl Marks & Co., Inc. v. Union of Soviet Socialist Republics*, 665 F.Supp. 323 (S.D.N.Y. 1987), *aff'd*, 841 F.2d 26 (2d Cir. 1988), which dismissed a certified class action based on bonds issued by Imperial Russia in 1916 ("1916 Bonds") for lack of subject-matter jurisdiction under §1605(a)(2). This decision is issue preclusive as to subject-matter and personal jurisdiction (collectively "FSIA jurisdiction") against Noble, which pleads it is the assignee of a bondholder included within the *Carl Marks* class, against the USSR, of which the RF is a successor state.

***Second***, Noble fails to allege any facts which establish that any of the "commercial-

---

[1] Unless otherwise stated, all emphases are added, and all citations, quotation marks, footnotes, ellipses, and brackets omitted. FSIA guarantees the "resolution of an immunity assertion before the sovereign can be compelled to defend the merits." *Process & Industrial Developments, Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 585 (D.C. Cir. 2020) ("*P&ID*"). Thus, the RF only raises FSIA jurisdictional defenses now and reserves all merits defenses—including the obvious bar of the statute of limitations to claims arising over 100 years ago—until jurisdiction is resolved in this Court, and, if necessary, on appeal. Exhibits are attached to the Sergei Sokolov Declaration.

activity" exception's three clauses apply, or that the RF or any other Defendant *themselves* engaged in an act of "commercial activity" regarding the long-dormant 1916 Bond.

*Third,* Noble cannot sustain FSIA jurisdiction over the RF based on the "successor-government" doctrine. Assuming the USSR was a successor government to the Russian Empire, the USSR ceased to exist in 1991 and was replaced by 15 successor *states*. The successor-state doctrine does not impose liability on states unless voluntarily assumed.  Here, neither the RF nor any other successor state assumed liability for the 1916 Bonds.

*Fourth,* assuming the RF is subject to successor-state FSIA jurisdiction under §1605(a)(2), this Court still lacks jurisdiction under the *Baker v. Carr* political-question doctrine. Following the November 1917 Revolution and end of the Russian Empire, the ensuing Bolshevik and Russian Soviet Federative Socialist Republic ("RSFSR") governments annulled all Imperial debts, including the 1916 Bonds. After its creation in 1922, the USSR continued the policy of disavowing liability for these debts. Following the USSR's dissolution in 1991, none of the successor states assumed liability for the 1916 Bonds. This Court has no criteria to establish successor-state liability for states which did not agree to assume their predecessor state's debts, or to apportion liability among the RF and other states which succeeded to the territory of the Russian Empire (and later USSR) under U.S. cases interpreting international law.

*Fifth,* Noble cannot sustain FSIA jurisdiction over the Ministry of Finance, Central Bank, and National Wealth Fund because they are only alleged to be political organs, subdivisions and alter egos of Russia, not sovereign states *themselves* capable of succeeding another state or government. Further, Noble makes no allegation they committed any act supporting jurisdiction.

*Sixth,* this Court lacks FSIA jurisdiction to grant declaratory and injunctive relief because Noble states no cognizable claim.

*In sum,* Noble's action, based on bonds lost to "dustbin of history," should be dismissed.

## BACKGROUND

### THE END OF THE RUSSIAN EMPIRE IN 1917 AND CREATION OF THE RSFSR

In 1917, the Russian Empire, also known as Imperial Russia, was an internationally recognized sovereign state. It incurred external debt obligations, including the 1916 Bonds. Following the February 1917 Revolution and overthrow of Tsar Nicholas II, "the United States was the first nation to recognize the new Provisional Government," which governed the same state. *Carl Marks*, 665 F.Supp. at 325. After the November 1917 Revolution, the Bolsheviks, led by Vladimir Lenin, seized power and established the RSFSR, which governed certain territory, part of which now comprises the RF.

### THE BOLSHEVIK GOVERNMENT'S REJECTION OF LIABILITY FOR THE RUSSIAN EMPIRE'S DEBTS, INCLUDING THE 1916 BONDS

In January 1918, the Bolshevik Government declared annulment of "all foreign loans" incurred by the Imperial Russian Government ("Imperial Debt")—including the 1916 Bonds, designed to fund an imperialist war and oppress the masses.[2] The RSFSR later reaffirmed the annulment internationally, including at the 1922 Genoa Conference, where it rejected demands by Western powers to assume Imperial and Provisional Government debts, declaring: "[G]overnments and administrations created by revolutions are not bound to respect the obligations of the Governments which have been overthrown … [and] Russia cannot be forced to assume any responsibility … for the cancellation of national debts.…"[3] Rather, the RSFSR

---

[2] Declaration of the Rights of the Working and Exploited People (Jan. 13, 1918), §III, Exh. 1; Decree "On the Cancellation of State Loans" (Jan. 21, 1918), as clarified by the Decree "On the rules for the Application of the Decree on the Cancellation of Government Loans" (March 7, 1918). Exh. 2, 3.

[3] Reply of Russian Delegation to Memorandum of May 2, 1922, Genoa Conference (May 11, 1922), 5 (79) ("Genoa Russian Reply"). Exh. 4.

demanded substantial reparations from the Western powers for illegally intervening in the Russian Civil War between 1918 and 1920, which caused massive destruction and loss of life.[4]

## THE CREATION OF THE USSR IN 1922 AND ITS REJECTION OF LIABILITY FOR THE RUSSIAN EMPIRE'S DEBTS, INCLUDING THE 1916 BONDS

In December 1922, four independent soviet republics established after the November 1917 Revolution—the RSFSR, the Ukrainian Soviet Socialist Republic ("SSR"), Byelorussian SSR, and Transcaucasian Federative SSR—formed the Union of Soviet Socialist Republics ("USSR"), which later expanded to include fifteen union republics.[5] The Soviet Government recognized this repudiation, asserting in 1923 to the U.S. Secretary of State: "Mr. Hughes … must know that 'obligations' can refer only to one and the same person, unless such obligations are formally transferred to another person. So for instance, America is not obliged to pay to France [or] Germany's debts. While Soviet Russia … is infinitely further from the Russia of Nicolai Romanoff and Alexander Kerensky, than the America of Mr. Hughes is from the Germany of Mr. Ebert."[6] The USSR long adhered to the policy of the RSFSR, rejecting the Russian Empire's debts.[7]

## THE DISSOLUTION OF THE USSR AND REPLACEMENT WITH SUCCESSOR STATES IN 1991

By December 1991, all 15 USSR constituent republics declared sovereignty and became independent successor states to its territory: the RSFSR, as well as Armenia, Azerbaijan, Belarus,

---

[4] *Id.*, 6 (80). Exh. 4.

[5] Treaty on the Formation of the USSR (Dec. 30, 1922). Exh. 5.

[6] Odette Lienau, *Rethinking Sovereign Debt,* Harvard University Press (2014), 67. Exh. 28.

[7] *See, e.g.,* Eileen Denza & Lauge Poulsen, *Settling Russia's Imperial and Baltic Debts*, 117 Am. J. Int'l L. 441, 468 (2023) (during negotiation of a political settlement of debts and assets of the Russian Empire with the UK in 1986, "the [Soviet government] reiterated that they were not under an obligation to settle…. [T]hey made it quite clear that their acceptance of responsibility was *ex gratia* and that they did not accept that successor states automatically succeeded to the obligations of the former states.") Exh. 13.

Estonia, Georgia, Kazakhstan, Kyrgyzstan, Latvia, Lithuania, Moldova, Tajikistan, Turkmenistan, Ukraine and Uzbekistan. The former USSR republics addressed the dissolution of the USSR and the assumption of its liability and property as successor states in a series of treaties.

### THE SUCCESSOR STATES ADDRESS THE USSR'S DEBTS AND ASSETS
### The 1991 USSR Debt Treaty

Dissolution of the USSR and succession to its external debts and assets were first addressed through the Treaty on Succession to the External State Debt and Assets of the USSR (Dec. 4, 1991) ("USSR Debt Treaty"), Exh. 6, signed by eight former USSR republics as "successor states" of the USSR and the USSR as the predecessor state. The Treaty classified all former USSR republics as "successor states" of the USSR, the "predecessor state," and defined "state succession" as "substitution of one state with another state in terms of responsibility for international relations over a territory," "successor state" as "the state that has replaced another state in the case of succession of states," and "predecessor state" as "a state that has been replaced by another state in the event of succession of states" (Art. 1). Article 1 limited the assumption of debt by all successor states, stating:

> [T]he external public debt of the USSR means any financial obligation *incurred by the USSR* or other persons lawfully authorized by the USSR in relation to another state, international organization, or any other foreign creditor.

Article 3 limited assumption of USSR debt to this definition, stating: "The Parties undertake to participate in the repayment and bear the costs of servicing the *external public debt of the USSR* … in proportions agreed upon by the Parties." To implement the USSR Debt Treaty, the parties agreed on a mechanism of repayment which only included the loans "*raised or guaranteed by the Government of the USSR*, the State Bank of the USSR, and Vnesheconombank of the USSR," the obligations "registered with Vnesheconombank of the USSR" and those

incurred by the "soviet organizations."[8] This excluded Imperial Debt, which the USSR did not incur and never recognized.

### The 1991 and 1992 CIS Agreements Confirming the USSR's Dissolution and the Status of the Parties as Successor States

The RSFSR, Belarus and Ukraine (later joined by nine other ex-USSR republics, but not Estonia, Latvia and Lithuania) formed a Commonwealth of Independent States ("CIS"), declaring: the USSR "as a subject of international law and a geopolitical reality ceases to exist";[9] "[w]ith the formation of the [CIS], the [USSR] ceases to exist";[10] and "all … members of the [CIS] are the successors to the rights and obligations of the former [USSR]."[11] The CIS states[12] dealt with the issue of distribution of the USSR's foreign property through the Agreement on the Distribution of All Property of the Former USSR Abroad (July 6, 1992), Exh. 10, in which they again described themselves as "successor states."

### The Bilateral Agreements Between the RF and CIS States

In October 1992, the CIS states decided "to resolve issues related to succession in relation to debts and assets of the former [USSR] on a bilateral basis."[13] By 1994, through bilateral

---

[8] *See* Agreement on Repayment and Protocol (Dec. 4, 1991), Chart 4. Exh. 27.

[9] Agreement on the Formation of the Commonwealth of Independent States (Dec. 8, 1991) ("1991 Dissolution Agreement"). Exh. 7.

[10] Alma-Ata Declaration (Dec. 21, 1991). Exh. 8.

[11] Decision of the Council of Heads of State of the CIS (March 20, 1992). Exh. 9.

[12] By the end of 1991, the RSFSR changed its name to the Russian Federation. *See* Statute of the RSFSR of 25 December 1991 No. 2094-I "On the change of the name of the state Russian Soviet Federative Socialist Republic." Exh. 12.

[13] Decision of the Council of Heads of State of the CIS (October 9, 1992). Exh. 11.

agreements with the RF, the CIS states[14] assigned their shares of the assumed USSR external debts and assets to the RF. These agreements acknowledged "the need for a prompt and final settlement of succession issues relating to the external public debt and assets of the former [USSR]" on a bilateral basis.[15]

## RECOGNITION OF THE RF AS A SUCCESSOR STATE TO THE USSR

The RF has been widely recognized as a successor state to the USSR, including by former members of the USSR[16] and internationally.[17] The U.S. has recognized the former republics of the USSR as successor states in numerous treaties. For example, in 1972, the U.S. and the USSR entered into the Anti-Ballistic Missile Treaty ("ABM Treaty"). In 1997, Belarus, Kazakhstan, the RF, and Ukraine, acting as the "successor states" of the USSR, with consent of the U.S., replaced the USSR in order to "assume the rights and obligations of the former USSR under the Treaty."[18] In 1991, the U.S. and USSR entered into the Treaty on the Reduction and Limitation of Strategic Offensive Arms ("START I"). In 1992, the U.S. signed the "Lisbon Protocol" to START I with

---

[14] Ukraine signed the bilateral agreement with the RF but did not ratify it and it never came into force. It has disputed the distribution of assets and debts of the former USSR among ex-USSR republics. Agreements by Kazakhstan and Tajikistan, although signed, have not entered into force.

[15] *See, e.g.,* Preamble to the agreement with Armenia (Sept. 7, 1993), Exh. 32. Similar text is found in RF agreements with Azerbaijan (Sept. 7, 1993), Georgia (Sept. 14, 1993), Kazakhstan (Sept. 6, 1993), Moldova (Oct. 19, 1993), Tajikistan (Dec. 17, 1993), Ukraine (Dec. 9, 1994), and Uzbekistan (Nov. 2, 1992), Exh. 33 to 39.

[16] *See, e.g.*, USSR Debt Treaty, Exh. 6, Art. 2 (identifying parties to the treaty as "the successor states to the USSR").

[17] *See* George Bush, Address to the Nation on the Commonwealth of Independent States, dated December 25, 1991 (noting "the end of the old Soviet Union" as well as emergence and recognition by the U.S. of the "new, independent nations," i.e., the "free, independent, and democratic Russia" along with other "former Soviet Republics" emerging out "of the Soviet empire"). Exh. 14.

[18] ABM Memorandum of Understanding among the U.S., Belarus, Kazakhstan, the RF, and Ukraine (Sept. 26, 1997). Exh. 24.

the RF, Belarus, Kazakhstan, and Ukraine, acknowledging that the former USSR has been replaced with "a number of independent states" which were all "successor states" of the former USSR.[19]

## BILATERAL TREATIES ADDRESSING DISPUTED IMPERIAL DEBT

As explained below, customary international law does not recognize liability of successor states for the external national debts of predecessor states that they do not agree to assume. Thus, when states succeed another state, such as when the USSR or Yugoslavia ceased to exist, any resolution of the predecessor state's external debts is done through bilateral and multilateral treaties (such as the USSR Debt Treaty), with the successor states resolving delicate political questions among themselves.

During World War I, the Russian Empire incurred significant Imperial Debt by issuing bonds and other credit instruments abroad, *e.g.*, in France, the U.K., and the U.S. Following the February 1917 Revolution, the Provisional Government also procured a significant loan from the U.S.[20] After the Imperial Debt was annulled in 1918, these countries engaged in political negotiations with the USSR and then the RF to, *inter alia*, resolve claims of their citizens. This resulted in three agreements: the 1933 Litvinov Agreement with the U.S. ("Litvinov Assignment"),

---

[19] Lisbon Protocol on START I (May 23, 1992), Preamble, Art. 1. Exh. 15. START I expired in December 2009. Given the role the USSR played as a member of the United Nations' security council and a nuclear power, the RF continued the legal personality of the USSR for certain functions, such as membership in the United Nations and the assumption of various treaties. *See, e.g.,* Yeltsin Letter to UN General Secretary, dated Dec. 24, 1991. Exh. 17. However, none of these agreements concern liability for the 1916 Bonds.

[20] *See* Boris Kheyfets, External Loans and Debts of the Tsarist Russia: History and Modern Situation. (2002) 92-94. Exh. 25.

Exh. 18;[21] the 1986 UK-USSR Agreement ("UK Settlement"), Exh. 19;[22] and the 1997 France-RF

Agreement ("French Settlement"), Exh. 20.[23]

In the UK and French Settlements, each state espoused the interests of its citizens in

addressing such claims. The UK and the USSR each agreed not to otherwise pursue or support

claims "on its own behalf nor on behalf of its physical and juridical persons."[24] Similarly, France

and the RF each agreed that they would "not, either on its own behalf or on behalf of [Russian and

French] individuals or legal entities, make any financial or property claims against the [other] Party

or otherwise support any such claims arising prior to May 9, 1945…."[25]

### POST-DISSOLUTION AGREEMENTS

Following the 1991 USSR Debt Treaty and bilateral agreements between the RF and other

successor states, under which the RF agreed to assume responsibility for the USSR's debt in return

---

[21] Under the Litvinov Assignment, the USSR "release[d] and assign[ed]" to the U.S. all claims against "American nationals, including corporations, companies, partnerships, or associations, and also the claim against the United States of the Russian Volunteer Fleet." Exh. 18, at 8. In return for "establishment of normal relations" with the U.S., the USSR assigned former Imperial assets in the U.S. to it, which "collected $9 million in pre-inflation money as a result of the Litvinov Assignment" that was "deposited into a Soviet Claims Fund" and used to partially pay Imperial Debt. *Carl Marks,* 665 F. Supp. at 327.

[22] The UK Settlement provided for mutual waiver of claims of each sovereign's citizens arising prior to 1939. The UK agreed to release to the USSR £2.65 million held in its bank accounts "of individuals and entities representing the former Imperial Russian Government, or the former Russian Provisional Government" in the UK. Exh. 19, Article 3.

[23] The French Settlement provided for mutual waiver of claims of each sovereign's citizens and the RF to pay $400 million to France, some of which was used to partially repay French holders of Imperial bonds. *See* French Settlement, Exh. 20; Russia Redeeming Czar's Bonds, by Agence France-Presse, New York Times November 19, 2000, Exh. 21. The agreement provides that payments made by the RF "shall not be considered as an admission by [either France or the RF] of any liability on its part in respect of any claims settled by this Agreement, or as a confirmation of the legal validity of any such claims." French Settlement, Exh. 20, Article 7.

[24] UK Settlement, Exh. 19 Art. 1, 2.

[25] French Settlement, Exh. 20 Art. 1, 2.

for its property, creditor states negotiated the payment of the USSR's debt with the RF. Creditor states recognized that negotiations "were made possible" by agreements between the RF and former USSR republics, which "relinquished claims on foreign assets [of the USSR] while Russia has accepted [the successor states'] share of the [USSR's] foreign debt liability" so "creditors could negotiate concerning the entire amount of the [former USSR's foreign] debt."[26] The U.S. and RF rescheduled repayment of $400 million owed to U.S. creditors until the end of 1993, with the balance of $1.1 billion to be repaid over 10 years. The U.S. government chose not to espouse debts owed to U.S. citizens for the Imperial Bonds.[27]

### THE GEOGRAPHY OF THE RUSSIAN EMPIRE, RSFSR, USSR, AND RUSSIAN FEDERATION

In 1917, the Russian Empire comprised mainly the territory that later became the 15 successor states of the USSR, as well as parts of Poland and Finland. Today, the RF consists only of the territory of the RSFSR as of 1991, plus parts of what was formerly Ukraine.[28]

### THE RUSSIAN STATE ENTITIES AT ISSUE

The Ministry of Finance is a federal executive authority of the RF responsible for state policy in the budgetary, tax, and financial fields. Its day-to-day affairs are conducted by the Minister of Finance, nine deputy ministers, 29 department heads, two directorate heads and other managers. It has over 1,400 employees. Sokolov Dec, ¶¶ 3-4.

---

[26] Report on Meetings between RF and Paris Club creditor countries (April 9, 1993), Exh. 16, §5.

[27] Agreement between the Government of the Russian Federation and the Government of the United States of America Regarding the Consolidation and Rescheduling of Certain Debts Owed to or Guaranteed by the United States Government (Sept. 30, 1993). Exh. 41.

[28] *See* Constitution of the RF (adopted by national referendum Dec. 12, 1993, as amended), art. 65. Exh. 22; RF Statute dated April 1, 1993 No. 4730-1 "On State Border of the Russian Federation", Art. 2. Exh. 42.

The Central Bank (Bank of Russia) is a legal entity separate from the RF government established by the RF Constitution and governed by Federal Statute of July 10, 2002, No. 86-FZ. Exh. 30, Art. 2. It has no relationship to the long-dissolved Imperial State Bank, and the RF and Central Bank are not liable for each other's obligations. *Id*., Art. 2. The Central Bank is responsible for protecting the national currency, banking and financial system (*id*., Art. 3); performs its functions independently from other RF state authorities (*id*., Art. 1); and covers its expenses from its revenues (*id*., Art. 2). Its day-to-day activities are overseen by the National Financial Council and carried out by its Board of Directors consisting of 14 directors, the Chairman, and 43 heads of various departments and directorates. Sokolov Dec, ¶¶ 5-9.

The National Wealth Fund is not a separate juridical person, but merely a designated portion of the federal budget, subject to separate accounting and management. It was established for fiscal stabilization and is managed by the Ministry of Finance and partially by the Central Bank. It cannot sue or be sued under Russian law. Sokolov Dec, ¶¶ 10-12.

## NOBLE'S HISTORY OF FRIVOLOUS CLAIMS

This is not the only frivolous action brought by Noble on ancient bonds. For example, Noble filed claims against the People's Republic of China ("PRC") based on bonds issued by the Imperial Government of China and Republic of China between 1898 and 1913, which were dismissed for lack of jurisdiction under §1605(a)(2). *See Noble Capital LLC v. People's Republic of China*, 2025 U.S. Dist. LEXIS 180351, *8-10 (D.D.C. Sep. 15, 2025). It filed another set of claims based on sovereign bonds issued by the Republic of China in 1919, alleging nonpayment by the PRC and its instrumentalities. *See* Complaint, *Noble Capital LLC v. People's Republic of China*, No. 25-cv-06146 (N.D. Ill. filed June 2, 2025). Attorney Noble himself filed claims in his personal capacity, seeking to offset $99,500 in rent for his New York City apartment owed to an entity indirectly owned by PRC, based on 1937 Republic of China bonds. *See Noble v. People's*

*Republic of China*, No. 1:24-cv-08257-VSB (S.D.N.Y. filed Oct. 30, 2024). The RF reserves its right to seek recovery of its legal fees and expenses under Rule 11 and otherwise, for defending this baseless action.

## SOURCES OF INTERNATIONAL LAW

United States courts look to the "current state of international law by consulting sources identified by Article 38 of the Statute of the International Court of Justice ('ICJ Statute'), to which the United States and all members of the United Nations are parties." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 175 (2d Cir. 2009). These sources consist of:

> (a) [I]nternational conventions, whether general or particular, establishing rules expressly recognized by the contesting states; (b) international custom, as evidence of a general practice accepted as law; (c) the general principles of law recognized by civilized nations; and (d) … judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.

*Id.,* 175 (quoting ICJ Statute, Art. 38(1)).

## <u>ARGUMENT</u>

FSIA "provides the sole basis for obtaining [subject-matter and personal] jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). "FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies[.]" *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). "Unless an enumerated exception applies, courts of this country lack jurisdiction over claims against a foreign nation." *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99, 101 (D.C. Cir. 2015).

"[F]oreign sovereign immunity provides not only a defense from liability but also a shield from trial and the attendant burdens of litigation." *P&ID,* 962 F.3d at 581. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170 (2017) requires that "a court

should decide the foreign sovereign's immunity defense '[a]t the threshold' of the action." *Id.*, 187. To do otherwise "would affron[t] other nations, producing friction in our relations with those nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation, based on legally insufficient assertions that sovereign immunity should be vitiated." *Id.*, 183. As a result, even if resolving the immunity question requires the Court to "inevitably decide some, or all, of the merits issues, so be it." *Id.*, 178.

Noble does not plead which exception to immunity under §1605(a) applies, which alone is sufficient for dismissal under *Bell* and *Helmerich*. Based on the Complaint, only the §1605(a)(2) "commercial activities" exception could possibly apply. Multiple reasons, each of which is dispositive, establish this Court lacks FSIA jurisdiction under this exception and generally.

## I.    *CARL MARKS* IS ISSUE PRECLUSIVE ON SUBJECT-MATTER JURISDICTION

Despite knowing that *Carl Marks* dismissed a claim on its Bond for lack of FSIA jurisdiction nearly forty years ago, Noble burdens this Court with baseless litigation raising the same meritless claim. Issue preclusion applies where: (1) "the same issue now being raised … [was] contested by the parties and submitted for judicial determination in the prior case"; (2) "the issue … [was] actually and necessarily determined by a court of competent jurisdiction in that prior case"; and (3) "preclusion in the second case [does] not work a basic unfairness to the party bound by the first determination." *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). "Res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).[29]

---

[29] "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). "Issue preclusion … refers to the effect of a prior judgment in foreclosing successive litigation of an issue

In *Carl Marks*, "the named plaintiffs [were] class representatives of holders of debt instruments issued by the Imperial Russian Government in 1916" and another issuance of Imperial Debt. 665 F.Supp. at 325.[30] The class alleged that the USSR remained obligated on these instruments notwithstanding the Bolshevik Government's 1918 decree proclaiming that "[a]ll foreign loans are annulled unconditionally and without exception." *Id.,* 326. The District Court identified the jurisdictional question posed: "[W]hether the FSIA applies … as to confer jurisdiction over a foreign sovereign for its commercial activities engaged in long before the effective date of the FSIA and before the 1952 Tate Letter." *Id.,* 336.[31] The Court granted the classes a default judgment, which the USSR moved to vacate and dismiss for lack of subject-matter jurisdiction. *Id.,* 325, 349.

Describing the jurisdictional question before it, the Court stated: "The Soviet Union is willing to concede that the FSIA can apply to claims arising before its effective date, so long as those claims did not arise before the publication of the Tate Latter in 1952," which "adopt[ed] … the restrictive theory of sovereign immunity that created a cause of action that had never existed theretofore, against foreign sovereigns for their commercial acts." *Id*., 347. Relying on *Jackson v. People's Republic of China*, 596 F. Supp. 386 (N.D. Ala. 1984), *aff'd*, 794 F.2d 1490 (11th Cir.

---

of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).

[30] *See Carl Marks,* Order dated Dec. 28, 1983, Docket No. 18, Exh. 40 ("ORDER granting class determination directing service of notice.…").

[31] This marked a fundamental shift in U.S. sovereign-immunity practice, as "in 1952 … the State Department announced, in the so-called Tate Letter, its adoption of the 'restrictive' theory of sovereign immunity.… Under the restrictive theory, immunity is extended only to a foreign sovereign's 'public acts' (*jure imperii*), not its 'private,' including commercial, acts (*jure gestionis*)." *Carl Marks* 665 F.Supp. at 335. Generally, "until 1952, the State Department ordinarily requested immunity in all actions against friendly foreign sovereigns." *Id.*

1986), which found no FSIA jurisdiction over claims seeking recovery on bonds issued in 1911 by the Imperial Chinese Government, *Carl Marks* likewise held that FSIA conferred no jurisdiction over claims arising from the 1916 Bonds predating the Tate Letter. Persuaded by *Jackson* and "all the other considerations advanced herein," the Court declared the default judgments "void for want of jurisdiction … and accordingly dismiss[ed] the Complaints." *Id.*

The Second Circuit affirmed, stating: "We agree with the district court that although the issuance of public debt falls within the 'commercial activity' exception of §1605(a)(2) of the FSIA, the federal courts have no jurisdiction over these suits." *Carl Marks*, 841 F.2d at 27-28 (holding "FSIA does not apply to confer jurisdiction over the instant actions").

All elements of issue preclusion based on *Carl Marks* are met here.

### A. The Identical Issue Was Litigated

The identical FSIA question—namely, whether §1605(a)(2) confers jurisdiction over claims based on the 1916 Bonds—was fully contested and decided in *Carl Marks*. The District Court held it lacked FSIA jurisdiction because the USSR retained absolute sovereign immunity. 665 F.Supp. at 335-39. The Second Circuit affirmed, holding that "the federal courts have no jurisdiction over these suits" because the FSIA "is inapplicable to claims arising before" the Tate Letter. 841 F.2d at 27. Thus, the FSIA jurisdictional issue is identical.

Even though dismissal for lack of jurisdiction is not a merits decision, it precludes re-litigation of the same jurisdictional issue under issue estoppel (res judicata)—sometimes called the doctrine of "jurisdictional finality."[32] *GAF Corp. v. United States,* 818 F.2d 901 (D.C. Cir. 1987)

---

[32] Under this doctrine, "principles of res judicata apply to jurisdictional determinations—both subject matter and personal." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 n.9 (1982). The rule is: "A party that has had an opportunity to litigate the question of … jurisdiction" may not "reopen that question in a collateral attack upon an adverse judgment." *Id.*

dismissed based on res judicata (collateral estoppel), holding: "Although the Second Circuit never reached the merits of … claims against the United States, it did affirm dismissal of the case on jurisdictional grounds. This judgment has preclusive effect, for the principles of *res judicata* apply to questions of jurisdiction as well as to other issues." *Id.*, 912. Similarly, *Dozier v. Ford Motor Co.*, 702 F.2d 1189 (D.C. Cir. 1983), held: "Because the doctrine of res judicata applies to dismissal for lack of jurisdiction as well as for other grounds, that determination bars the present suit in federal district court."[33] *Id.*, 1191.

### B.  The Identical FSIA Determination Was Essential to the Judgments

*Carl Marks* dismissed the action for lack of jurisdiction, holding the identical FSIA exception did not apply because the USSR retained sovereign immunity.

### C.  Issue Preclusion Works No Basic Unfairness to a Party Bound by the First Determination

Noble is indisputably in privity with the *Carl Marks* class, as it pleads "Noble Capital is the assignee and lawful owner of Russian Sovereign Bonds." Compl., ¶35. "Preclusion may be justified based on a variety of pre-existing 'substantive legal relationship[s]' between the person to be bound and a party to the judgment." *Taylor*, 553 U.S. at 894. "Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.* And, while not required to assert issue estoppel, the RF is in privity with the USSR as a successor state.

---

[33] *See also Williams v. Romarm S.A.*, 2020 U.S. Dist. LEXIS 57029, *8 (D.D.C. Apr. 1, 2020) (dismissing FSIA action based on issue preclusion, holding "collateral estoppel prevents plaintiffs from relitigating personal jurisdiction."); *Mortimer Off Shore Servs., Ltd. v. Germany*, 2012 U.S. Dist. LEXIS 42993, *35-37 (D. Mass. Mar. 28, 2012) (giving preclusive effect to a decision rejecting FSIA commercial-activity jurisdiction and dismissing, holding: "The relevant issue here is whether the commercial activity exception to the FSIA applies to render the FRG subject to suit…. It is undisputed that the Second Circuit reached a valid, binding, final judgment on this issue, that the issue was actually litigated, and that the determination of the issue was essential to the court's holding and judgment.").

As applied here, "[a] judgment in a properly entertained class action is binding on class members in any subsequent litigation." *Cooper v. Federal Reserve Bank*, 467 U.S. 867, 874 (1984). The judgment in *Carl Marks*—a "properly entertained class action"—is thus binding on Noble in this litigation. *Id. See also Berryman-Turner v. District of Columbia*, 233 F.Supp.3d 26, 33-35 (D.D.C. 2017) (dismissing claims as barred by res judicata where plaintiff was a member of a prior federal class action asserting substantially identical claims); *Brown v. Wells Fargo Bank, N.A.,* 25 F.Supp.3d 144, 151 (D.D.C. 2014) (holding claims were barred by res judicata where plaintiff was bound by a prior federal class-action settlement). Noble inherits the claim with its jurisdictional defect, and it may not re-litigate a question decided decades ago.

**In sum,** Noble's claims are barred because allowing re-litigation by an assignee of a member of the *Carl Marks* class would defeat the purpose of issue preclusion and undermine FSIA's jurisdictional bar, subjecting the RF and its sovereign entities to the undue burden of litigation precluded by *P&ID, supra.*

## II.    NOBLE FAILS TO PLEAD CLAIMS UNDER THE CLAUSES OF §1605(a)(2)

Noble alleges that Russia, "in breach of the successor government doctrine, has repudiated and continues to repudiate certain sovereign debts for money borrowed by its predecessor government, the Russian Imperial Government." Compl, ¶1. It claims "[t]he Court has subject-matter jurisdiction over this action, pursuant to … [§]1605(a) … because … the foreign states are not entitled to immunity." Compl, ¶11.  Noble's poorly pled claim is hopeless.

**First,** Noble does not specify **which** FSIA exception applies, despite its burden to do so at the threshold of the action under *Bell Helicopter* and *Helmerich*. The Court should dismiss the Complaint for lack of FSIA jurisdiction on this basis alone. *Butler v. Sukhoi Co.*, 579 F.3d 1307 (11th Cir. 2009), reversed the denial of a motion to dismiss for lack of FSIA jurisdiction where the complaint "ple[d] the FSIA as the district court's basis for subject-matter jurisdiction, but ***fail[ed]***

***to specifically invoke any of the FSIA's statutory exceptions*,**" which was "insufficient to divest appellants of their sovereign immunity because … it does not bring the claim within one of … the statutorily-enumerated exceptions … under the FSIA." *Id.*, 1313-14. *Sequeira v. Republic of Nicaragua*, 815 Fed. App'x 345 (11th Cir. 2020), affirmed dismissal when plaintiff "did not re-allege in his amended complaint that the expropriation exception applied," but only invoked the commercial-activity exception, holding: "[T]he district court did not err when it did not consider the expropriation exception because [plaintiff] did not properly raise [it] as a possible basis for subject matter jurisdiction." *Id.,* 351.

***Second***, based on the Complaint, and given *Carl Marks*, only the FSIA §1605(a)(2) "commercial activity" exception could possibly apply. However, amendment to plead a specific clause would be futile. Under this exception, a foreign state is not immune in any case "in which the action is based":

> **[1]** [U]pon a commercial activity carried on in the [U.S.] by the foreign state; or **[2]** upon an act performed in the [U.S.] in connection with a commercial activity of the foreign state elsewhere; or **[3]** upon an act outside the territory of the [U.S.] in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the [U.S.].

28 U.S.C. §1605(a)(2).

Noble does not, and cannot, allege facts establishing that any clause applies.

### A. Commercial Exception Clause One Does Not Apply

Under Clause One, the plaintiff must allege facts showing its "action is … based upon a commercial activity carried on in the [U.S.] by the foreign state." *MMA Consultants 1, Inc. v. Republic of Peru*, 719 Fed. App'x 47, 53 (2d Cir. 2017) (quoting 28 U.S.C. §1605(a)(2)). Under §1605(a)(2), "an action is 'based upon' the particular conduct that constitutes the gravamen of the suit." *OBB Personenverker AG v. Sachs*, 577 U.S. 27, 35-36 (2015) (affirming dismissal for lack of FSIA jurisdiction where tort action for injuries sustained on a railway platform in Austria was

not "based upon" purchase of railway ticket in U.S. but on "wrongful conduct and dangerous conditions in Austria") (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993) (affirming dismissal for lack of FSIA jurisdiction).

The gravamen of Noble's claim against the RF is that a sovereign, presumably the Bolshevik Government, or, perhaps, the USSR, "repudiated"—i.e., failed to redeem—the 1916 Bond. Compl, ¶1. This is insufficient. The plaintiff in *MMA* was the holder of "fourteen bearer bonds that Peru signed and executed in 1875," which sued "alleging breach of contract based on Peru's failure to remit payment of principal and interest on the bonds." *MMA*, 719 Fed. App'x at 48-49. *MMA* rejected plaintiff's argument "that the 'gravamen' of its suit [was] not Peru's failure to pay for the bonds, but rather Peru's signing and executing the bonds in 1875," stating courts "do not conduct the gravamen test by engaging in an 'exhaustive claim-by-claim, element-by-element analysis' of a plaintiff's suit" but "[i]nstead … ask one simple question: what action of the foreign state '*actually injured*' the plaintiff?" *Id.*, 52 (italics in original) (quoting *Sachs*, 136 S.Ct. at 395). "Here, the answer is Peru's failure to redeem the bonds.":

> There was "nothing inherently wrongful" about Peru's initial issuance of the bonds, and Peru's alleged breach of contract is the "foundation" of [plaintiff's] suit. ***In sum, the gravamen of [plaintiff's] suit is Peru's failure to redeem the bonds upon presentment.***

*Id,* at 52 (quoting *Sachs*, 577 U.S. at 396). As a result, *MMA* affirmed dismissal for lack of FSIA jurisdiction because Peru's failure to redeem the bonds did not constitute commercial activity carried on in the U.S. *Id.*, 48, 53.

Similarly, any refusal to redeem the 1916 Bond was a decision that occurred in Bolshevik Russia, or arguably the USSR (or, for the sake of completeness, the RF, even though Noble made no demand on it)—in any case, not in the U.S. *MMA*, 719 Fed. App'x at 53 (holding Peru's refusal "to compensate [plaintiff] for the bonds was a decision that occurred abroad") (citing *Rogers v.*

*Petroleo Brasileiro, S.A.*, 673 F.3d 131, 137-38 (2d Cir. 2012) (reversing and dismissing for lack of FSIA jurisdiction because sovereign's refusal to convert bonds into preferred shares occurred in foreign county). In a similar claim to recover on sovereign bonds, *Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) held: "Argentina's attempt to refinance the [bonds] rather than pay them according to their terms" was "an act outside the territory of the [U.S.]." *Id.*, 611.

This is well known to Noble. *Noble Capital*, 2025 U.S. Dist. LEXIS 180351 (D.D.C. Sep. 15, 2025), dismissed claims based on ancient bonds against the People's Republic of China for lack of subject-matter jurisdiction, holding, *inter alia*, "the gravamen of Noble Capital's suit … is the nonpayment of interest and principal on historical bonds," which "were carried on in China, not the [U.S.]"; Clause One of "FSIA's commercial-activity exception therefore does not apply." *Id.*, *6-8. Since Noble's claim here is "based on" the failure to redeem a bond, which "was a decision that occurred abroad," the sovereign's "failure to redeem the bond[] is not 'a commercial activity carried on in the [U.S.],' and the first clause therefore does not strip [it] of immunity." *MMA*, 719 Fed. App'x at 53.

### B. Commercial Exception Clause Two Does Not Apply

Under Clause Two, the plaintiff must allege facts showing its action is "based … upon an act performed in the [U.S.] in connection with a commercial activity of the foreign state elsewhere." *Rogers*, 673 F.3d at 137 (citing FSIA §1605(a)(2)). "[J]urisdiction will lie where an action is 'based upon some commercial activity … that had substantial contact with the [U.S.].'" *Id.* (quoting *Nelson*, 507 U.S. at 356).

A "threshold requirement" under Clause Two "is that the relevant act was performed in the [U.S.]." *Rogers*, 673 F.3d at 137 (citing FSIA §1605(a)(2)). The refusal to redeem the 1916 Bond was "a decision not to perform," which "occurred in that country"; therefore, it was "not an act in the [U.S.]." *Id.*, 137-38 (holding sovereign's "denial of the conversion [of bonds] sought by the

plaintiffs was an act in Brazil") (quoting *Guirlando v. T.C. Ziraat Bakasi S.A.*, 602 F.3d 69, 76, 81-82 (2d Cir. 2010) (affirming dismissal for lack of FSIA jurisdiction because sovereign did not perform act in U.S. and no direct effect here). *See also MMA*, 719 Fed. App'x at 53 ("Peru's decision not to compensate [plaintiff] for the bonds was a decision that occurred abroad"). Since the decision by the Bolshevik Government—or arguably the USSR (or the RF)—was not "an act in the U.S.," Noble has failed to allege any acts which would give rise to jurisdiction under Clause Two. *Rogers*, 673 F.3d at 137-38 (holding Clause Two was inapplicable because the sovereign's decision not to convert bonds into shares was "not itself an act [in the U.S.]," even though "the failure to act may have a legally significant effect in the place where the act was to have been performed") (quoting *Guirlando*, 602 F.3d at 76).

### C.  Commercial Exception Clause Three Does Not Apply

Clause Three requires a plaintiff to prove its lawsuit is (1) "based … upon an act outside the territory of the [U.S.]," (2) that "was taken 'in connection with a commercial activity' of [the foreign sovereign] outside this country"; and (3) "caused a direct effect in the [U.S.]." *Weltover*, 504 U.S. at 611 (quoting 28 U.S.C. §1605(a)(2)). Noble fails to allege facts which satisfy the second and third requirements.

#### 1.  The Second Requirement of Clause Three Does Not Apply

Regarding the second requirement, *Weltover* held that Argentina's "attempt to refinance" bonds was "taken in connection with a commercial activity of [the foreign sovereign] outside this country … within the meaning of the FSIA." *Id.*, 614. Nonetheless, this does not help Noble.

***First,*** Noble fails to allege that the RF ***itself*** "perform[ed]" any "particular actions" of the type "by which a private party engages in trade and traffic or commerce" or that it "act[ed] in the manner of a private player" in the bond market, because it does not allege the RF issued the 1916 Bond at issue. *Weltover*, 504 U.S. at 614-15 (quoting 28 U.S.C. §1603(d)). *Weltover*'s holding that

21

"Argentina's issuance of the [bonds] was a 'commercial activity' under the FSIA," *id.*, 617, has

no application to the RF here because it did not issue 1916 Bond.

**Second,** assuming, *arguendo*, successor-state liability applies to the RF, the "automatic

assumption of liability by a successor state … would not meet the requirements of the FSIA's

commercial-activity exception." *Mortimer Off Shore Servs. v. Fed. Republic of Germany*, 615 F.3d

97, 109 (2d Cir. 2010). The plaintiff in *Mortimer* held bearer bonds which were issued in 1928 by

fourteen Prussian banks located in territory that later was part of West Germany and East Germany,

which were guaranteed by Prussia and matured in 1958. *Id.*, 98-100. It sought to enforce them

against the Federal Republic of Germany ("FRG"), alleging the sovereign assumed liability for the

bonds in several treaties and statutes. *Id.*, 101-04.

*Mortimer* dismissed claims based on East German-issued bonds for lack of FSIA

jurisdiction "because [plaintiff] failed to allege an action [by East Germany or the FRG] … based

upon a commercial activity" under the successor-state doctrine.[34] *Id.*, 109-10. Since "[a]ccession

to liability by the rules of customary international law entails no action by the successor state with

respect to the commercial activity at issue—the assumption of liability"—and "[t]he state performs

no action when it automatically assumes liability, … no 'action' within the meaning of FSIA's

§1605(a)(2) occurs when a successor state accedes to liability." *Id*. Thus, "jurisdiction under the

FSIA based on such an accession will not lie." *Id.*, 110. Noble likewise makes no allegation that

the RF itself committed any act, and thus "no 'action' within the meaning of FSIA's §1605(a)(2)

occur[red]," regardless of whether successor-government or successor-state liability applies.

### 2.  The Third Requirement of Clause Three Does Not Apply

---

[34] In contrast, *Mortimer* held the plaintiff stated a claim as to West German bonds because the
sovereign had "explicitly assumed liability" for those bonds, which "constitute[d] an action under
section 1605(a)(2)." 615 F.3d at 107.

Noble has not alleged, and cannot allege, claims under the third requirement.

***First,*** Noble cannot allege any effect because the 1916 Bond is a collectible, not a legitimate security. In *Morris v. People's Republic of China*, 478 F.Supp.2d 561 (S.D.N.Y. 2007), plaintiff sought to recover "almost $90 billion … for the failure of the PRC to pay the principal and interest on bonds issued in 1913 by the predecessor government[.]" *Id.*, 564. The Court held "it lack[ed] subject-matter jurisdiction over [plaintiffs'] complaint as the PRC is entitled to sovereign immunity" because plaintiff "likely purchased the long-defaulted bonds for a few hundred dollars in a 'collectibles' market," rather than "as legitimate financial instruments,"[35] and thus "it can hardly be considered a financial loss when he receives exactly what he paid for." *Id.*, 567-68. Like *Morris*, Noble purchased a collectible, not a legitimate security, as evidenced by the certification of authenticity which it provided to Defendants' counsel, Exh. 26, and therefore "receive[d] exactly what [it] paid for." *Id.*, 568. Because Noble could not have "purchased the bond[] as [a] financial instrument," it cannot "claim to have suffered an 'effect' in a commercial sense envisioned by the FSIA." *Id.*, 568.

***Second,*** *Morris* also held plaintiff could not make "a showing of 'direct effect'" because "[t]he 'direct effect' from the legally significant acts, the breaching of the terms of the bonds, was felt in 1939 and 1960, not in 2000 when plaintiff purchased … the defaulted bonds in a 'collectibles' market." *Morris*, 478 F.Supp.2d at 568-69. Likewise, regarding Noble, the "direct effect" from the "breaching of the terms of the bond[]" was felt when it was annulled in 1918 and matured in 1921, not when Noble "purchased … the defaulted Bond[] in a 'collectibles' market" a century later. *Id.*

---

[35] *Morris* noted "the SEC has obtained civil injunctions preventing the sale of ancient bonds as anything other than collectibles." *Id.*, 567 n.9 (citing SEC Litigation Release No. 15989 (Dec. 1, 1998); SEC Litigation Release No. 18393 (Oct. 6, 2003)).

**Third,** regarding the third requirement, *Weltover* held:

Respondents had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments. Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a "direct effect" in the [U.S.]: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming.

*Weltover*, 504 U.S. at 609.

In this case, the 1916 Bond provided: "The Imperial Russian Government promises to pay … [$1,000] in gold coin of the [U.S.] … at the office of the National City Bank of New York, in the City of New York … or at the option of the holder in Roubles, at the offices of the Imperial State Bank of Russia…."[36] Unlike *Weltover*, Noble makes no allegation that it demanded payment at National City Bank, nor could such payment occur because when Noble recently purchased its bond, National City Bank no longer existed. Thus, it is impossible that there could be a direct effect on Noble in the U.S. based on *Weltover. See MMA Consultants*, 719 Fed. App'x at 54 (holding Clause Three did not apply because while "the bonds clearly indicate[d] that the intended place of performance is the [U.S.], because both principal and interest [we]re to be paid in [U.S.] gold coin at the office of Hobson Hurtado, financial agents of Peru in New York, … Hobson Hurtado ceased to exist over 130 years ago" and "[a]s a result, it is literally impossible for the contract to be performed at its original intended location.").

**In sum,** Noble has not and cannot plead claims under §1605(a)(2).

## III.  THIS COURT LACKS JURISDICTION UNDER FSIA BECAUSE THE RF IS A SUCCESSOR STATE, NOT SUCCESSOR GOVERNMENT, TO THE USSR

---

[36] *See* Bond Produced by Noble and Text Transcription, Exh. 26.

Noble's claims are premised on the false assumption that the RF and other Defendants are subject to FSIA jurisdiction predicated on a "breach of the successor government doctrine." Compl., ¶1. Noble's theory is a transparent attempt to piggyback on the statement in *Carl Marks* that the rights and liabilities of a sovereign state are vested in "the State as abstract entity," so that the government which can sue or be sued "on the rights and obligations of the State is the one recognized by the [U.S.] Executive." 665 F.Supp. at 340 (citing *Guaranty Trust v. United States*, 304 U.S. 126, 137 (1938)). Since "the Soviet Government was uniformly treated as the successor in interest to the Provisional Government, which in turn was the successor in interest to the Imperial Russian Government," *Carl Marks* held the USSR could be sued on the 1916 Bonds. *Id*., 341. Noble's invocation of the successor-government doctrine fails because the USSR dissolved in 1991 and the RF is a successor ***state*** of the USSR, not the successor ***government,*** under established U.S. law.

Indeed, Noble alleges: in February 1917, the Russian Provisional Government became the successor government of the vast territory that had comprised the Russian Empire, and in October 1917, the government became the successor government of this same territory, which was eventually recognized as the USSR by the United States in 1933. Compl., ¶¶21-22, 24. But Noble then changes the subject from governance of the ***entire territory*** of the state originally called the Russian Empire, and later called the USSR, to governance of a much more limited area which it calls "Russia." Noble never defines what it means by "Russia," but the Complaint's four references to "Russia" make clear that Noble is referencing the territory that now lies within the RF,[37] which

---

[37] Compl., ¶7 (RF "is the recognized government having authority and jurisdiction over Russia"); ¶14 ("Prior to 1916, the Russian Imperial Government was the recognized government with authority and jurisdiction over Russia"); ¶21 ("In February 1917, the Russian Provisional Government" had "authority and jurisdiction over Russia"); ¶24 (beginning in 1933 the Soviet Union had "authority and jurisdiction over Russia").

obviously excludes the vast territories of the 14 other independent states that were formerly Soviet Republics, as well as parts of Poland and Finland within the Russian Empire.

Critically, Noble's allegations relating to the territory it calls "Russia" do not allege the RF is successor government of the USSR, asserting merely: "In December 1991, the Russian Federation was established as the successor to the Soviet Union with authority and jurisdiction over Russia…." Compl., ¶27. But Noble does not, and cannot, plead that the RF is the *same* state as the USSR, for an obvious reason: "In December 1991 the Soviet Union dissolved, to be replaced by various successor states, including the Russian Federation." *Agudas Chasidei Chabad of United States v. Russian Federation*, 528 F.3d 934, 945 (D.C. Cir. 2008). Noble is too clever by half.

*First*, by pleading the RF is a "successor to the Soviet Union," *not* a "successor *government* to the Soviet Union"—that is, leaving out the pertinent noun—Noble deceptively avoids an undeniable fact, noted by the D.C. Circuit in *Chabad*: the RF is a successor *state* to the USSR, which ceased to exist in 1991 and was replaced by 15 newly independent "successor states." The CIS states declared "[w]ith the formation of the [CIS], the [USSR] ceases to exist"[38] and they were "the successors to the rights and obligations of the former [USSR]."[39] The RF has been widely recognized as a successor *state* to the USSR.[40] And, for avoidance of doubt, the RF agrees it is a successor state to the USSR.

*Second,* under customary international law as interpreted in the U.S., it is well established that "[w]hen the state ceases to exist, its capacities, rights, and duties terminate." Restatement (Third) of Foreign Relations Law ("Restatement"), §208, cmt. a. Further, absent an "agreement

---

[38] Alma-Ata Declaration, *supra*.

[39] Decision of the Council of Heads of State of the CIS, *supra*.

[40] *See e.g.* the USSR Debt Treaty, *supra*, Art. 2; George Bush Address, *supra.;* ABM Memorandum, *supra.;* Lisbon Protocol, *supra.*

between predecessor and successor states, responsibility for the public debt of the predecessor, and rights and obligations under its contracts, remain with the predecessor state….” *Id.*, §209(2).[41] As the U.S. itself explained in an *amicus* brief filed in *767 Third Ave. Assocs. v. Consulate Gen. of Socialist Federation of Yugoslavia*, 218 F.3d 152 (2d Cir. 2000), which held that the five successor states which emerged from the dissolution of Yugoslavia did not bear its liabilities:

> There is no rule of law or international custom that requires a successor state to accept responsibility for the extra-territorial debts of its predecessor to private parties, or that determines how liability should be apportioned when there is more than one successor state that agrees to accept liability.[42]

The analysis of customary international law set forth by the Executive Branch and the Restatement is owed great deference.[43]

**Third,** in accord with the Restatement and the U.S.’s position, imposing successor-state liability is not possible where, as here, there are ***multiple*** successor states, ***none*** of which agreed to assume responsibility for Imperial Debt. *Yucyco* rejected enforcing a $29.5 million loan guarantee made by Yugoslavia against Slovenia, one of five then-successor states. Finding “Yugoslavia has been dismembered, its boundaries have been dramatically redrawn, and multiple

---

[41] As the Restatement, §210(3) consistently explains, “When part of state becomes a new state, the new state does not succeed to the international agreements to which the predecessor state was party, unless expressly or by implication it accepts such agreements and the other parties agree or acquiesce.” This further underscores that any successor-state liability under international law must be voluntary.

[42] Brief for *Amicus Curiae* United States of America, Jan. 31, 2000, at 15-16 & n.*, Exh. 23 (citing, *inter alia*, *Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 215-16 (S.D.N.Y. 1997), and Restatement §§ 208-210).

[43] *See, e.g.*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 761 & n.21 (noting the “serious weight” given the view of the Executive Branch on international law matters); *United States v. Yousef*, 327 F.3d 56, 92 n.25 (2d Cir. 2003) (“[I]t is highly unlikely that a purported principle of customary international law in direct conflict with the recognized practices and customs of the United States and/or other prominent players in the community of States could be deemed to qualify as a *bona fide* customary international law principle.”).

sovereigns exist where once there stood a single nation," such that decisions involving "the mere succession of governments are inapposite," the Court concluded that "[a]s a successor state, Slovenia is not legally bound by any contract executed by the former Yugoslavia unless Slovenia has voluntarily 'assumed' the responsibilities of the former state." 984 F.Supp. at 217-18. Neither the RF nor the other successor states to the USSR accepted responsibility for the 1916 Bonds, which had long been annulled by the Bolshevik Government, along with other Imperial Debt.

*In sum*, the Court need not address the existence or application of successor-state liability because Noble—resorting to artifice and ambiguity, in referring to "Russia" and omitting the noun after "successor"—has not pled it. Rather, the Court can dismiss based on Noble's inadequate pleading alone. *See Butler*, 579 F.3d at 1313-14; *Sequeira*, 815 Fed. App'x at 351.[44] And, as discussed below, even if Noble had pled successor-state liability, this Court would still lack FSIA jurisdiction under the *Baker v. Carr* "political-question" doctrine.

## IV.  THIS COURT LACKS FSIA JURISDICTION UNDER THE POLITICAL-QUESTION DOCTRINE BECAUSE RECOGNIZING LIABILITY AMONG SUCCESSOR STATES IS RESERVED TO THE EXECUTIVE BRANCH AND THE COURT HAS NO CRITERIA TO ESTABLISH OR APPORTION SUCCESSOR-STATE LIABILITY

Noble's Complaint is a troubling attempt to embroil this Court in a claim which arose more than a century ago, when the Russian Empire was protected by absolute immunity. Despite the state practice between the U.S. and USSR which resulted in the Litvinov Assignment—establishing resolution of Imperial Debt is for the Executive—Noble importunes this Court to decide the political questions of whether successor-state liability exists and, if so, how to apportion such liability among those states. This Court should decline Noble's invitation to aggravate

---

[44] Given that Noble has not pled successor-state liability, it is premature for Defendants to address in more detail an argument which Noble has not made. The RF reserves the right to submit an expert opinion on international law if Noble contests the issue.

relations between the U.S. and the RF, especially at this sensitive time, and increase the potential risk of subjecting the U.S. to reciprocal claims in Russian Courts, as *Helmerich* warned—for its involvement in the 1918-1920 Russian Civil War, for example.

Under Supreme Court precedent, this Court lacks jurisdiction under the "political question" doctrine. *Al-Tamimi v. Adelson*, 916 F.3d 1, 7-8 (D.C. Cir. 2019) (stating doctrine is "jurisdictional") (citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S 208, 215 (1974)).[45] "The political-question doctrine arises from the constitutional principle of separation of powers." *Id.*, 8 (*quoting Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)). It "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Id.* In its analysis, the Court "follow[s] a three-step process":

> ***First***, we identify the issues raised by the plaintiff's complaint. ***Next***, we use the six *Baker* factors to determine whether any issue presents a political question. ***Finally***, we decide whether the plaintiff's claims can be resolved without considering any political question, to the extent one or more is presented.

*Al-Tamimi*, 916 F.3d at 8-9 (quoting *Baker*, 369 U.S. at 217). Under this process, Noble's Complaint presents two non-justiciable political questions: (1) Does state-successor liability exist when the successor states do not agree to assume an alleged liability of the predecessor state?; and (2) If so, how does a court apportion liability for the 1916 Bond among the 15 states that succeeded to the territory of the former USSR?

### A. Issues Raised by the Complaint

---

[45] *See also Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006) ("As we find this [political-question] issue to be dispositive, we do not reach any other jurisdictional issues, such as sovereign immunity") (citing *Schlesinger*, 418 U.S. at 215); *Joo v. Japan*, 413 F.3d 45, 47-48 (D.C. Cir. 2005) (affirming dismissal on basis of political-question doctrine, stating it "need not resolve the question of … whether Japan is entitled to sovereign immunity under the FSIA … before considering whether the complaint presents a nonjusticiable political question.").

The Complaint raises whether Defendants should be required to pay some or all of the 1916 Bond(s) based on successor-state liability (incorrectly relying on successor-government liability).

### B. The *Baker* Factors Compellingly Establish Political Questions

In *Baker v. Carr,* 369 U.S. 186 (1962)—the "fountainhead of the modern political-question doctrine" (*Al-Tamimi*, 916 F.3d at 7)—the Supreme Court defined a non-justiciable political question as follows:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.

"In conducting the analysis directed by *Baker* …, [the Court is] mindful of the three inquiries more recently formulated by Justice Powell as defining the analysis necessary to determine the application of the political-question doctrine[:] (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against intervention?" *Antolok v. United States*, 873 F.2d 369, 381 (D.C. Cir. 1989) (quoting *Goldwater v. Carter*, 444 U.S. 996, 998 (1979) (Powell, J., concurring)). "To find a nonjusticiable political question, [the Court] need only conclude that one factor is present, not all." *Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017) (citing *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) (noting "[t]he *Baker* analysis lists the six factors in the disjunctive, not the conjunctive").

### 1. The Issue Involves Questions Committed by the Constitution to the Executive Branch

Regarding the first *Baker* factor, the issue is committed by the text of the Constitution to a coordinate branch of Government because recognizing and apportioning liability among successor states is "precisely the type of determination that is reserved to the Executive in the first instance." *767 Third Ave.*, 218 F.3d at 161 (citing *Can v. United States*, 14 F.3d 160, 163 (2d Cir. 1994) (holding "the recognition of any rights of succession to a foreign government's power or property is in the first instance constitutionally committed to the Executive Branch")).

Plaintiffs in *767 Third Ave.* sought unpaid rent for offices leased to the former Socialist Federal Republic of Yugoslavia, which was "replaced by five successor states"[46] following its "disintegrat[ion]" in 1991. *Id.*, 155. Plaintiffs asked the Court "to determine (1) that the successors are liable for debt incurred by the [former Yugoslavia]; and (2) the proper allocation of that debt among the successors." *Id.*, 159. The Second Circuit "agree[d] with the district court that virtually all of the *Baker* … factors" applied, holding the question of whether Yugoslavia's five successor states "have rights and obligations with respect to [its] property and the extent of those rights and obligations" is "precisely the type of determination that is reserved to the Executive in the first instance, and which has not been made." *Id.*, 160-61.

The Second Circuit gave deferential consideration to the U.S. *amicus* brief, which explained: "[W]here one state succeeds another, and/or one or more new states are created, there is no rule of international law that provides for automatic assumption by successor states of

---

[46] The five successor states at that time were: "Slovenia, Croatia, Bosnia-Herzegovina, Macedonia, and the Federal Republic of Yugoslavia which is composed of Serbia and Montenegro." *767 Third Ave.*, 218 F.3d at 155.

contracts entered into by the dissolved predecessor state."[47] The U.S. concluded: "Here, the appropriate share of each successor state in such liabilities, and indeed whether successors will be held directly accountable at all for such debts incurred by the former sovereign, is simply not susceptible to judicial determination and can be decided only in the political arena," and "[t]hus, issues of whether and how former [Yugoslavia] liabilities will be apportioned to the five successors present a non-justiciable political question."[48]

Agreeing with the U.S. position, *767 Third Ave* held: "A determination by this court of the allocation of debt among the successors might hinder or prejudice the future resolution of this issue through negotiations or another determination by the Executive," which "outcome would directly interfere with executive policy prerogatives." 218 F.3d at 160 (quoting *Can*, 14 F.3d at 163). Identically, Noble's Complaint asks this Court to determine that the RF is liable as a successor to the Russian Empire for the 1916 Bonds under international law, which requires, *inter alia*, a determination regarding the proper allocation of that debt among the 15 successor states to the USSR—"precisely the type of determination that is reserved to the Executive in the first instance." *Id.*, 161. Since determining whether successor-state liability exists under international law, and, if so, apportioning liability among successor states is "committed by the text of the Constitution to a coordinate branch of Government," a political question is presented under the first *Baker* factor.

### 2. Resolution of the Question Demands the Court Move Beyond Its Judicial Expertise

---

[47] U.S. *767 Third Ave.* Amicus Br. at 15-16, Exh. 23 (citing *Yucyco*, 984 F.Supp. at 215-18 (absent controlling agreement, treaty, or other instrument of allocation, claim against Slovenia for "equitable share" of guarantee made by former Yugoslavia dismissed as a political question).

[48] Exh. 23, 16-17. The U.S. elaborated that "[t]he present policy of the United States is to encourage the successors to the former [Yugoslavia] to reach an internationally negotiated settlement of these issues," but until such settlement is reached, "claims raising these issues are simply unsuitable for judicial resolution." *Id*. 22.

Regarding the second *Baker* factor, resolution of the question involves areas beyond judicial expertise because "federal courts do not have the authority or the means to determine the equitable distribution of the public debt of a foreign state among several successor states." *767 Third Ave.*, 218 F.3d at 161-62 (citing *Yucyco*, 984 F.Supp. at 219) (equitable allocation among five new republics would require the court to make policy determinations "of a kind clearly for nonjudicial discretion") (quoting *Baker*, 369 U.S. at 217).

**First,** *767 Third Ave.* held it had "no standards for judging a claim of succession to a former sovereign," rejecting the plaintiffs' contention "that joint-and-several liability principles provide a judicially manageable standard for fashioning relief" because "[s]uch state-law principles have no basis in international law, which is the body of law we must turn to in this case." 218 F.3d at 161. Since "no agreement between [former Yugoslavia] and the successors regarding assumption of [its] liabilities ha[d] been formulated," *767 Third Ave.* concluded "there [wa]s no rule of law that automatically subrogates successor states to their predecessor's debt." *Id.* (citing Restatement, §209(2)). Noble's Complaint clearly requires this Court to determine whether successor liability exists in the absence of any agreement to assume liability by successor states, and, if so, how it is to be determined.[49] In short, while the RF is a successor state to the USSR, and has agreed to assume liability for debts ***incurred*** by the USSR, neither the RF nor any other USSR successor state agreed to assume liability for the 1916 Bonds.

---

[49] In these circumstances, it would be up to the United States to espouse or advance the claims of its citizens against the RF through negotiations, as occurred, for example, between the U.S. and the USSR resulting in the Litvinov Assignment partially resolving Imperial Debt in 1933, Exh. 18; the 1986 UK Settlement, Exh. 19; and the 1997 French Settlement, Exh. 20. *See Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1523 (D.C. Cir. 1984) ("Under well-established principles of international law, a sovereign possesses the absolute power to assert the private claims of its nationals against another sovereign," which "does not depend on the consent of the private claimholder"); *Mark v. Republic of the Sudan*, 77 F.4th 892, 898 (D.C. Cir. 2023) ("Since the Founding, the President has exercised the power to espouse the claims of its citizens.").

**Second,** even if successor-state liability exists, there has been no agreement among the 15 successor states to the USSR regarding the assumption of liabilities for the 1916 Bonds. Thus, the political questions presented by Noble's Complaint are beyond areas of judicial expertise because the Court lacks judicially discoverable and manageable standards for resolving them. *Id.*, 160-62; *Baker*, 369 U.S. at 217. *See also Yucyco Ltd.*, 984 F.Supp. at 217 (holding "this Court lacks satisfactory criteria for a judicial determination of … 'the property, rights and interests which pass to the successor States' to properly determine the fair share of the debt that should be borne by Slovenia.") (quoting Vienna Convention on Succession of States in Respect of State Property, Archives and Debts, April 8, 1983, art. 41, 22 I.L.M. 306, 324 (1983)).[50]

### 3. Prudential Considerations Strongly Counsel Against Judicial Intervention

Regarding the remaining *Baker* factors, prudential considerations strongly counsel against judicial intervention because the Court's "undertaking independent resolution of [Noble's] claim is impossible without expressing lack of the respect due of the Executive Branch." *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 72 (2d Cir. 2005). *Whiteman* vacated an order directing discovery on FSIA jurisdiction and entered judgment dismissing claims of "present and former nationals of Austria, and their heirs and successors, who [sought] compensation for the taking of their property in that country during the Nazi Era and Second World War … in deference to the stated foreign policy interests of the [U.S.]" because it was "clear this case meets the fourth [*Baker*] test." *Id.*, 59-61, 72.

---

[50] *See also* U.S. Amicus Br. in *767 Third Ave.* at Exh. 23, 14 (stating "liability for allocation of debts among successors present issues for which there are no identifiable judicial standards"), and 22 ("As a component of the recognition of foreign sovereigns, the methods by which the United States ultimately resolves successor states' claims to assets, and successor states' liability for debts, must be answered on political grounds by the political branches of government, and are thus 'outside the competence' of courts") (quoting *Can*, 14 F.3d at 163) (quoting *National City Bank v. Republic of China*, 348 U.S. 356, 358 (1955)).

Determining whether successor-state liability applies to the RF for the 1916 Bond requires "sensitive considerations of international relations [which] uniquely demand single-voiced statement of the Government's views"; thus, judicial review could "imperil the amicable relations between governments and vex the peace of nations." *Antolok*, 873 F.2d at 384 (quoting *Baker*, 369 at 211).[51] Rather, it is up to the Executive Branch to decide whether to espouse or advance the claims of its citizens who hold 1916 Bonds against Russia. *See Asociacion*, 735 F.2d at 1523.

*In sum*, determining whether liability exists for Imperial Debt which the USSR did not incur, and which the RF and other successor states did not assume and, if so, apportioning liability among them under the 1916 Bonds are political questions under the first two *Baker* factors and its remaining prudential factors.

### C.  The Political Questions Are Inextricable from Noble's Claims

The political questions of whether successor-state liability exists and, if so, how to apportion liability among the 15 successor states to the former USSR are inextricable from Noble's claims. *Baker*, 369 U.S. at 217; *see also 767 Third Ave.*, 218 F.3d at 161 (holding "questions of title were 'inextricably intertwined with the question of state succession and sovereignty,' which are reserved to determination by the executive branch") (quoting *Can*, 14 F.3d at 165).

*In sum*, Noble's claims pose intractable political questions which strip this Court of FSIA jurisdiction. Resolution of Noble's claim is for the Executive Branch.

## V.    THIS COURT LACKS FSIA JURISDICTION OVER THE MINISTRY OF FINANCE, CENTRAL BANK, AND NATIONAL WEALTH FUND

---

[51] *See also Al-Tamimi v. Adelson*, 916 F.3d 1, 13 (D.C. Cir. 2019) (holding issue of "who has sovereignty over the disputed territory" in Israel "plainly implicates foreign policy and this is reserved to the political branches" and "the court would create an inter-branch conflict by deciding who has sovereignty over the disputed territory").

"[T]he plaintiff bears the initial burden to overcome by producing evidence that an exception applies[.]" *Bell Helicopter,* 734 F.3d at 1183. Noble does not remotely meet its burden to establish FSIA jurisdiction over the Russian Ministry of Finance, Central Bank, or National Wealth Fund. Suing them is pure harassment.

### A.  There Is No Basis to Extend Successor-Government or Successor-State Liability to These Defendants

*First,* the Ministry of Finance, Central Bank, and Wealth Fund are not sovereign states subject to liability under either the successor-government or successor-state doctrine. The Wealth Fund is not even a legal entity which can sue or be sued under Russian law, which separately requires dismissal. *See Pablo Star Ltd. v. Welsh Gov't*, 170 F.Supp.3d 597, 610 n.8 (S.D.N.Y. 2016) (dismissing: "Visit Wales" was "not a separate legal person and thus not an 'agency or instrumentality' under the FSIA"; "the proper defendant" was "the Welsh Government itself.").

*Second*, Noble's failure to allege any "action … based on a commercial activity" by the RF in support of the "successor-government doctrine" applies equally to successor-state liability, which entails "no action by the successor state with respect to the commercial activity at issue" and thus "no 'action' within the meaning of FSIA's §1605(a)(2) occurs when a successor state accedes to liability." *Mortimer*, 615 F.3d at 109-10 (quoting §1605(a)(2)). Also, Noble fails to allege the Ministry of Finance, Central Bank, and Wealth Fund committed any acts whatsoever.

### B.  Noble Fails to Meet Its Burden to Establish Alter-Ego Liability

"Under the FSIA, the 'instrumentality' of a sovereign is afforded both sovereign immunity and a presumption of separateness from the sovereign" which "applies to jurisdictional issues." *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 238 (D.C. Cir. 2024) (*quoting Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446 (D.C. Cir. 1990)). "That presumption can be overcome, however, if the instrumentality is the sovereign's alter ego." *Id.*,

238 (quoting *TransAmerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 847 (D.C. Cir. 2000)).

In claiming the Ministry of Finance, Central Bank and Wealth Fund are alter egos of the RF, Noble alleges only they are "integral parts of the same foreign state (i.e., Russia)," "organ[s] or political subdivision[s]" and "alter ego[s]" of Russia, with "a principal-agent relationship," and that "treating [them] as separate from [Russia] would work a fraud or injustice." Compl., ¶¶40-41, 45-46, 50-51. These conclusory allegations without any facts are wholly insufficient.

In a declaratory action to hold Argentina's Central Bank liable for that state's debts and attach its assets based on an alter-ego theory, *EM Ltd. v. Banco Cent. De la Republica Argentina*, 800 F.3d 78 (2d Cir. 2015) held the "presumption of separateness may be rebutted by evidence establishing an alter-ego relationship between the instrumentality and the sovereign state that created it." *Id.,* 90. "Specifically, … an alter-ego relationship established if: (1) the instrumentality is 'so extensively controlled by its owner that a relationship of principal and agent is created'; or (2) the recognition of an instrumentality's separate legal status would work a 'fraud or injustice.'" *Id.* (quoting *First Nat'l City Bank v. Banco Para El Commercio Exterior De Cuba (Bancec)*, 462 U.S. 611, 629 (1983)). "The plaintiff bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship." *Foremost-McKesson*, 905 F.2d at 447. Noble has not met, and cannot meet, this high standard.

***First,*** Noble has not alleged a single fact showing the RF "exercises significant and repeated control over the instrumentalit[ies'] day-to-day operations" by: "(1) us[ing] the instrumentalit[ies'] property as its own; (2) ignor[ing] the instrumentalit[ies'] separate status or ordinary corporate formalities; (3) depriv[ing] the instrumentalit[ies] of the independence from close political control that is generally enjoyed by government agencies; (4) requir[ing] the

instrumentalit[ies] to obtain approvals for ordinary business decisions from a political actor; [or] (5) issu[ing] policies or directives that cause the instrumentalit[ies] to act directly on behalf of the sovereign state." *EM Ltd.*, 800 F.3d at 91, 96 (holding allegations "do not establish … that [Argentina] so extensively controlled [the central bank]'s day-to-day operations as to transform [it] into [the sovereign's] alter ego" because "[m]ost of the actions allegedly taken by [bank] are governmental functions performed by most central banks," and thus "the first prong of the *Bancec* test has not been met.").

**Second,** even if these Defendants were alter egos today, Noble cannot allege facts demonstrating a principal-agent during the relevant time frame, i.e., 1918, when the 1916 bond was repudiated by the Bolsheviks and RSFSR. Even if the time frame were extended to 1991 when the USSR dissolved, neither the RF as an independent state nor any of the other Defendants yet existed. *See TIG*, 110 F.4th at 238-39 (affirming dismissal for lack of subject-matter jurisdiction, holding alter-ego theory was "plainly insufficient to survive Argentina's motion to dismiss" where "[t]he only facts [plaintiff] identified as showing that [instrumentality] was Argentina's alter ego at the time [it] entered the reinsurance contracts in 1979 were … liquidation resolutions in the 1990s and 2000s," which "[o]n their face, the far-later-in-time resolutions [did] not speak" to "whether Argentina exerted complete domination over [instrumentality]" at the relevant time) (citing *Transamerica*, 200 F.3d at 848).[52]

---

[52] *See also Despotovich v. Republic of Croatia*, 2023 U.S. App. LEXIS 20238, *6-7 (2d Cir. 2023) (affirming dismissal for lack of FSIA jurisdiction under the commercial-activity exception, rejecting argument that Croatia was alter ego of defendant corporation because it "did not exist as an independent state until … after the [contract at issue] was executed and breached," and "[t]hus, *whatever [plaintiff] may be able to show about the relationship between Croatia and [corporation] at a later point, he cannot establish that Croatia was [its] alter ego at the time of the transaction,*" which "is the crucial commercial activity on which jurisdiction is purportedly based").

*Third,* Noble also fails to plead any facts showing that the RF engaged in any abuse of the corporate form, or that it used "the separate juridical status" of the Ministry or Central Bank to perpetrate a fraud or injustice. *EM Ltd.*, 800 F.3d at 95-96 (holding allegations "fall far short of the flagrant frauds and injustices" necessary to impose alter-ego liability under second *Bancec* prong because plaintiffs did "not allege that [central bank's] separate juridical status has been actively used by Argentina to block plaintiffs' enforcement attempts against … itself, or that Argentina has ... used [the bank] to frustrate the collection efforts of its creditors, or that [it] treated [bank] as a 'sham' entity to hide its own assets.").[53]

*In sum*, Noble fails to allege these Defendants (1) are subject to successor-government or successor-state liability; (2) have committed any acts under the commercial-activity exception; or (3) are alter egos of Russia. Therefore, it has not established FSIA jurisdiction over them.

## VI.    THIS COURT LACKS JURISDICTION UNDER FSIA TO GRANT DECLARATORY OR INJUNCTIVE RELIEF OVER DEFENDANTS IN THE ABSENCE OF A COGNIZABLE CLAIM

Instead of pleading breach of *its* bond contract—presumably because its claim is hopelessly outside the statute of limitations—Noble has pled a bizarre action for declaratory and injunctive relief to manufacture a $225.8 billion claim which seeks relief almost entirely on behalf of non-party bondholders. Putting aside its lack of standing to assert claims for non-parties, Noble fails to establish FSIA jurisdiction because it does not state any cognizable cause of action.

The Declaratory Judgment Act ("DJA") "provides, in pertinent part, that '[i]n a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an

---

[53] Likewise, under Point II, *supra*, the commercial-activity exception does not apply because Noble does not allege that these Defendants issued the 1916 Bonds or engaged in any relevant activities in the U.S. *EM Ltd.*, 800 F.3d at 97 (holding commercial-activity exception did not apply where foreign central bank "was not … involved in Argentina's decision to cease making principal and interest payments on [the] bonds").

appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought.'" *Glenn v. Fay*, 222 F.Supp.3d 31, 35 (D.D.C. 2016) (quoting 28 U.S.C. §2201(a)). "In order to issue declaratory relief a court must first determine that there is a 'case or controversy' within the meaning of Article III of the [U.S.] Constitution and the [DJA]," which "inquiry should focus on whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and realty to warrant [its] issuance." *Id.*, 35-36.

 "The availability of declaratory relief presupposes the existence of a judicially remediable right," which "require[s] the plaintiff to assert some underlying cognizable claim that arises under the Constitution or federal law." *Westinghouse Elec. Co. LLC v. Korea Elec. Power Corp.*, 694 F.Supp.3d 51-52 (D.D.C. 2023). "A declaratory judgment under §2201 is not a separate cause of action, but rather a prayer for relief." *Glenn*, 222 F.Supp.3d at 35. Similarly, "[i]njunctive relief … is not a freestanding cause of action, but rather—as its moniker makes clear—a form of relief to redress the other claims asserted by Plaintiff." *Base One Techs., Inc. v. Ali*, 78 F.Supp.3d 186, 199 (D.D.C. 2015).

Noble's Complaint seeks only declaratory judgment (Counts I-IV) and injunctive relief (Count V)—it does not assert a cause of action for breach of contract. On point under the DJA is *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011), which affirmed dismissal because "Plaintiffs have not alleged a cognizable cause of action and therefore have no basis upon which to seek declaratory relief" and the DJA did not provide a cause of action because "[i]t is a well-established rule that the availability of declaratory relief presupposes the existence of a judicially remediable right." *Id.*, 778. Doubly on point is *Kialegee Tribal Town v. U.S. DOI*, 2022 U.S. Dist. LEXIS 177829

(D.D.C. Sept. 29, 2022), which dismissed a similarly defective action: "[Plaintiff's] complaint never pleads a cognizable cause of action" because its "two counts are (1) a request for a declaratory judgment and (2) a request for injunctive relief. Needless to say, these are remedies, not cognizable causes of action" and "[a]lthough the Court must liberally construe [plaintiff's] complaint …, [it] may not … add theories of relief to [the] complaint that are not there." *Id.*, *12-13. As in *Kialegee*, the Court lacks jurisdiction because Noble's claims for declaratory and injunctive relief are not independent causes of action.[54]

   **In sum,** this Court lacks FSIA jurisdiction over the declaratory and injunctive-relief claims because Noble states no cognizable cause of action to support them.

## CONCLUSION

   For the foregoing reasons, the Court should dismiss for lack of FSIA jurisdiction against all Defendants without leave to amend, given Noble can plead no set of facts to correct the deficiencies in its Complaint.[55]

---

[54] *See also Miriyeva v. U.S. Citizenship & Immig. Servs.*, 9 F.4th 935, 945-46 (D.C. Cir. 2021) (affirming dismissal where "the district court otherwise lacked jurisdiction over [plaintiff's] claims" and thus "it did not have subject-matter jurisdiction to entertain her [DJA] claim either").

[55] *See Rukoro v. F.R.G.,* 976 F.3d 218, 227-28 (2d Cir. 2020) (affirming denial of leave to amend as futile where amendments did not "sufficiently allege[] that the expropriated property [wa]s currently present in the [U.S.] in connection with commercial activity"); *Turan Petro. Inc. v. Ministry of Oil & Gas of Kazakhstan*, 2022 U.S. App. LEXIS 7980, *7 (D.C. Cir. 2022) (affirming denial of motion to amend as futile because plaintiffs' "proposal … neither shows any commercial character of the Ministry's acts nor otherwise establishes a jurisdictional nexus to the [U.S.]").

Dated: January 28, 2026                           MARKS & SOKOLOV, LLC

                                                  */s/ Bruce Marks*
                                                  Bruce S. Marks (Bar I.D. CO0034)
                                                  Thomas Sullivan (Bar. I.D. PA0122)
                                                  Maria Grechishkina (Bar I.D. PA0119)
                                                  1835 Market St., 17th Floor
                                                  Philadelphia, PA 19103
                                                  Tel. (215) 569-8901
                                                  marks@mslegal.com
                                                  tsullivan@mslegal.com
                                                  mgrechishkina@mslegal.com

                                                  *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on January 28, 2026, the foregoing document was filed electronically and served upon all counsel of record via the Court's CM/ECF filing system in accordance with the Federal Rules of Civil Procedure.

Dated: January 28, 2026

MARKS & SOKOLOV, LLC
*/s/ Bruce S. Marks*
Bruce S. Marks (D.C. Bar No. CO0034)
1835 Market St., 17th Floor
Philadelphia, PA 19103
Tel. (215) 569-8901
Fax (215) 569-8912
marks@mslegal.com

*Counsel for Defendants*